# CHARLESTON.

John O. Pendleton *et als.* v. Fred L. Letzkus *et als.*

Submitted September 26, 1922.    Decided October 3, 1922.

1.  TAXATION—*Agreement Between Persons Attending Tax Sale as Bidders Not to Bid Against Each Other so That There is no Competition is Grounds for Setting Aside Purchase by Any of Such Persons.*

    Where it appears that persons attending a tax sale as bidders agree in advance of the sale that they will not bid against each other, with the result that in no case is there any competition in the bidding upon any piece of property offered at the sale, any purchase at such sale by such persons will be set aside.  (p. 618.)

2.  EVIDENCE—*Circumstances and Conduct of Bidders at a Tax Sale May Take the Place of Direct Evidence to Show That an Agreement Not to Bid Against Each Other Was Entered Into.*

    It is not necessary that such an arrangement or agreement be proved by direct evidence.  If it satisfactorily appears from the circumstances shown, and from the conduct of the parties during the sale, and subsequent thereto, that such an agreement existed, such showing will be as effective to set aside the sale as though proven by direct evidence.  (p. 618.)

3.  TAXATION—*Purchase at a Tax Sale by County Officers Having Duties to Perform in Connection with Such Sales Will Be Carefully Scrutinized.*

    Where county officers or their deputies, having duties to perform in relation to the sale of delinquent lands for taxes, become the purchasers of such lands at a delinquent tax sale, their conduct in relation thereto will be carefully scrutinized, particularly where their official duties conflict with their personal interest.  (p. 618.)

Appeal from Circuit Court, Brooke County.

Suit by John O. Pendleton, Executor, etc., and others against Fred L. Lutzkus and another. Decree for plaintiff and defendant Fred L. Lutzkus and another appeal.

*Riley & Riley,* for appellees.

*Ramsey & Williams* and *Erskine, Palmer & Curd,* for appellants.

RITZ, JUDGE:

The suit was brought by the executor and devisees under the will of Joseph H. Pendleton for the purpose of setting aside a tax deed made by the clerk of the county court of Brooke County to the defendant Gullette for a tract of land owned by the said Joseph H. Pendleton in his lifetime, and also a deed made by the said defendant Gullette to the defendant Letzkus. The circuit court entered a decree setting aside the tax deed and the deed made to the defendant Letzkus thereunder, and from that decree this appeal is prosecuted.

Joseph H. Pendleton was the owner of a tract of about 178 acres of land situate in Brooke county. It appears that he acquired this land in 1879. It also appears that it was a very valuable farm and well known to the people of the county, being worth from eighteen to twenty thousand dollars. Joseph H. Pendleton died in the year 1881. By his will he devised this farm to his executors to be by them sold and the proceeds distributed in certain ways. At the time of his death he was a resident of the City of Wheeling in Ohio county, and the will was probated in that county. It was not recorded in the county of Brooke until the year 1902, more than 20 years after his death. After the death of Joseph H. Pendleton the land was charged on the land books of Brooke county in the name of "J. H. Pendleton heirs," and it continued to be charged in this way after the recordation of the will in 1902. The taxes were not paid on this tract of land for the year 1912, and the same was returned delinquent for the non-payment of these taxes. Not

being redeemed within the time required by law, the same was sold by the sheriff of Brooke county on the 7th day of December, 1914, and at said sale was purchased by the defendant Letzkus. On the 9th of December Letzkus, according to his statement, assigned his purchase to the defendant Gullette. On the 20th of December, 1915, the defendant Gullette obtained a deed from the clerk of the county court of Brooke county for the land, and on the 20th of November, 1916, she conveyed the same to the defendant Letzkus, and it is these two deeds which were set aside by the decree complained of.

While a number of grounds are urged in justification of the decree of the lower court, one principally relied upon is that the evidence shows that there was an agreement or understanding among the bidders at the sheriff's sale for the purpose of suppressing bidding and permitting each purchaser to acquire the whole of the tract of land upon which he bid for the taxes thereon. It appears that at this sale there were 28 tracts or lots of land sold; that the defendants Letzkus and Brashear purchased 26 of these tracts, and that the other two were purchased, one by the witness W. F. Foster, and the other by George P. Marsh. In no case was anything less than the whole of the lot or parcel of land sold for the taxes. The defendant Brashear was at that time clerk of the county court of Brooke county. The defendant Gullette was his assistant in his office. It appears that she was not a regularly appointed deputy, because of the fact that under the laws of West Virginia at that time a woman could not be a deputy clerk of the county court, but it sufficiently appears from the evidence that she performed most of the duties of the office, and all of the duties usually performed by a deputy. Brashear was a dentist and physician, and it appears that he was engaged during most of his time practicing his professions. The defendant Letzkus lived at that time, and still lives, in the State of Missouri, but formerly lived in Brooke county, and is a first cousin of the defendant. Brashear, and at the time of this sale was at home visiting his parents. He says that he had no arrangement or under-

standing with his cousin Brashear in regard to bidding on this property; that before he left his home in Missouri to come east on his visit he saw in the Brooke county paper, to which he was a subscriber, the advertisement of the Pendleton farm for sale; that he was well acquainted with this farm, and the effect of his testimony is that it was because of this advertisement that he attended the tax sale when in Brooke county. He leaves the impression by his evidence that it was his desire to obtain this Pendleton farm, or an interest in it at the tax sale that induced him to be present thereat and purchase the same. Notwithstanding this, two days after he made this purchase he turned the same over to the defendant Gullette for exactly what he paid at the sheriff's sale, according to his statement, and gives as his excuse for doing so that he had bought more than he was able to carry at the sale. It is significant, however, that he should assign away his purchase of the particular tract of land which was his inducement for attending the sale, and retain other pieces of land purchased by him at the sale which it appears did not have any particular attraction for him. Nearly all of the other purchases made by him at the sale were of properties belonging to the Wellsburg Coal Company and the Wellsburg & State Line Railroad, against both of which companies there were then proceedings pending for the purpose of foreclosing liens upon the properties, and, of course, any purchase of them at a tax sale would amount to no more than lending the money at twelve per cent. interest, inasmuch as it was practically a certainty that these properties would be redeemed within the time allowed by law. But this is not the only strange thing about his conduct. It appears that on the very same day on which he assigned this Pendleton purchase to the defendant Gullette, he assigned all of his other purchase to the defendant Brashear, and, of course, this latter assignment to Brashear had the effect of destroying his excuse for making the assignment to the defendant Gullette. The defendants Letzkus and Brashear both testified that there was no understanding or agreement between them at the time of the sale that either would not bid against the

other, or that there would be any community of interest as
to the purchase made, and the defendant Gullette testifies
that she was not at the sale and knew nothing about what
was done in regard to this Pendleton property until the
defendant Letzkus proposed to assign it to her for just what
he paid for it, and she, having some money lying idle, ac-
cepted his proposition. It is significant that while she had
a bank account, as appears from the record, and that she
drew checks for small amounts, such as $1.50, she paid Lutz-
kus, according to her contention, the ninety-some dollars for
this property in currency, and not by check. John O. Pen-
dleton, the surviving executor of the will of his father, was
stricken with a severe and fatal illness shortly after this tax
sale was made, and the distributees under the will did not
discover that the property had been sold for taxes until after
the deed was made to the defendant Gullette therefor. It
appears that in the summer of 1916 the sheriff of Brooke
county called the attention of one of the devisees under the
will to this fact, and he immediately made an investigation
of the records of Brooke county. He went to the county
seat of Brooke county and sought the record of delinquent
land sales. He says that he found in the clerk's office only
one book referring to delinquent lands, and that the legend
on the back of this book did not indicate that it contained a
record of sales of delinquent lands, but simply a record of
lands returned delinquent. However, he made an examina-
tion of the contents of the book, and found that it did con-
tain, not only the delinquent land returns, but also the re-
turns of sales of delinquent lands; that the book was indexed,
and that he examined this index, but was unable to find that
the Pendleton land was sold at the sale in 1914; that the
various matters recorded in the book were not in separate
parts thereof, a different part being assigned to each sub-
ject, but that the matters recorded therein ran along con-
secutively as they were recorded, consisting of returns of
delinquent lands, the delinquent lands redeemed, the delin-
quent lands purchased by the state, the delinquent lands
purchased by individuals, and other information; that upon

being unable to find from the index any sale of this land in
the year 1914 he inquired of the defendant Gullette, who
was in charge of the office, in regard thereto, and that she
took the book, and after going through it located the return
of sale of delinquent lands made in 1914; that he then called
her attention to the fact that while everything else in the
book was indexed in the name of the delinquent owner,
there was no index as to any of the land sold in 1914, and
that upon observing this she thereupon indexed the book
as to this sale. Upon inquiry he found that she had ob-
tained a deed for the land, and he proposed to her to redeem
it by paying her all the taxes and expenses she had incurred,
and one hundred dollars in addition, but she advised that
she would be unable to make him any answer until she con-
sulted the defendant Brashear; that he then told her to let
him know in regard to the matter as soon as she had advised
with her employer, and that she promised to do so; that he
likewise asked her if she would allow the matter to remain
in its present status and make no conveyance of the land
until after she had come to a conclusion as to the proposals
made, and that she promised to make no conveyance of the
land until the negotiations between them were concluded;
that he thereupon returned to his home at Wheeling, and
not hearing from her in a week or ten days he called her
up by telephone and asked her in regard to it; that she
told him she could not take the hundred dollars; that he
thereupon asked her if she would enter into negotiations
with him in regard to its redemption if he came to Wells-
burg for the purpose; that she advised him that there was a
levy term of the court on at that time, and that she would
be too busy to consult with him until after that was over;
that he thereupon advised her that as soon as that was over
he would come up and see if they could not arrange for the
redemption of the land, and that she agreed to this, and
agreed that no change would be made in the status of the
property until he had an opportunity of further consulting
with her; that he did, thereafter go to Wellsburg with his

counsel for the purpose of further negotiations, and when he got there was informed by her that she had turned the whole matter over to her attorney; that he thereupon consulted the attorney indicated by her, and this attorney advised that he did not represent her, but that he represented the defendant Brashear in the matter; that he thereupon offered to pay to this attorney all of the taxes paid upon the land subsequent to the sale, the amount paid at the sale, and all expenses incurred in connection therewith, as well as some additional sum, which tender was refused, and he advised that the owner would not permit the property to be redeemed, but would make a sale of it for a substantial consideration; that later he made a similar tender to the defendant Gullette, but was advised that she had sold the property to the defendant Letzkus, and had no further interest in it, and this suit was thereupon brought for the purpose of setting aside the tax sale.

We are impressed with the conclusion, after a very careful consideration of this record, that there was an agreement and understanding between the bidders at this tax sale as to just what should happen thereat, and that they knew before the sale was made to whom each of the properties would be sold; that the sale was nothing in the world but carrying out an agreement made between the bidders beforehand. Foster, who bid in one piece of the property at the sale, and who was very adverse to the plaintiffs in his testimony, testifies that when he went there he consulted with the defendant Brashear and told him that he purposed bidding on a certain piece of property, and that Brashear agreed not to bid against him on it. As a result of this agreement he got the whole of the property for the taxes. He says that he does not recollect whether he agreed with Brashear not to bid on the other property. It appears, however, in this record that Brashear had been engaged in the business of buying properties at tax sales for sometime, and it is hardly probable that he agreed to refrain from bidding in the interest of Foster unless Foster made a like agreement in his interest. Foster also testifies that the custom in

making these sales was for the sheriff to inquire who would pay the taxes against the property for it, and if there was more than one bid, or more than one person willing to take the property for the taxes, then he would inquire who would take a less interest than the whole of the property and pay the taxes. His recollection, and the record in this case bears him out, is that in no instance was there more than one bid as to any piece of property offered on this occasion, for it appears that no sale was made for less than the whole of the tract or lot of land offered for sale. It is shown that this Pendleton land was worth from fifteen to twenty thousand dollars; that it was a farm with which all of the bidders were well acquainted, and notwithstanding this fact the report of the sale would indicate that nobody was willing to pay the taxes on it for anything less than the entire farm. This would not be so significant were it not for the fact that the lands of the Wellsburg Coal Company and the Wellsburg and State Line Railroad Company, which were also well known, and were exceedingly valuable properties, one of them selling for over a hundred thousand dollars very shortly after this sale, and the other for fifty thousand dollars, were likewise sold, and no one was willing to take any of these properties for less than the entire interest therein. It appears that at other tax sales a less interest than the whole was frequently sold in satisfaction of the delinquent taxes. It appears further from the report of sales that the purchases made by the defendants Letzkus and Brashear constituted twenty-six of the twenty-eight items of sale, and that they practically alternated in purchasing the lands. It also appears from the evidence that neither ever bid against the other. It appears that there were a number of pieces of the Wellsburg Coal Company property, all of which were used as one property; that some of them were purchased at this sale by Letzkus and some by Brashear, and that neither of them had any desire to secure any interest in a piece of property that the other bid on. The close relationship which existed between Brashear and Letzkus, and the fact that Letzkus turned over all of his purchases imme-

diately after the sale to Brashear, except the purchase of the Pendleton farm, and that he turned this over to Brashear's assistant and employee at the same time, is significant. If Letzkus was making these purchases without any collusion between him and Brashear, and with the expectation of making money out of them, it is hardly probable that within two days, without any apparent reason, he would have surrendered all of his prospective profit.

Another significant thing is the fact that this report of sales was recorded in the book provided for the purpose, but not indexed. The point is made that the law contemplates that a separate book will be provided in which to record the report of delinquent sales, and it also contemplates that these sales will be indexed so that interested parties may have easy access to them. Whether this is a true interpretation of the law, we need not inquire, but as bearing upon the relation of these defendants to the tax sale made in December, 1914, we do think the fact that the record of the sale was not indexed is very significant. It appears that every other entry in this book was properly indexed in the name of the delinquent purchaser, but that there was no attempt to index any of the sales made in 1914. This of itself might not have any particular significance, but when we consider that the parties charged with the proper recordation of this report were the very parties most vitally interested in the sale, it does have a peculiar bearing. In considering this case it must be borne in mind that the defendant Brashear was clerk of the county court of Brooke county, the county officer charged with many duties in relation to delinquent land sales; that the defendant Gullette was his assistant, and according to the evidence was for all practical purposes his deputy; that the other defendant was his first cousin. While it may be that county officers and their deputies are not forbidden to purchase lands at a delinquent sheriff's sale, certainly their conduct in relation to such purchases, particularly where they have official duties to be performed in connection therewith must be closely scrutinized; and particularly is this true where their interest is in conflict

with their public duties.  It is urged that there is no evidence tending to show any understanding between the defendants in this case as to the purchases at this tax sale.  There is no direct evidence, but there are many circumstances which compel us to the conclusion that these defendants knew in advance just what was going to happen when that sale was made.  Ordinarily such understandings cannot be proved by direct evidence.  They have to be drawn from circumstances.  The things which happen at the sale itself, taken in connection with the acts of the parties afterward, may leave no room to doubt that there was such an understanding or agreement at the time of the sale, and where these circumstances exist they will be just as effectual to prove the fact as though direct evidence were introduced for that purpose.  In fact, it may be said that such circumstances are proof even of a stronger character than the direct testimony of witnesses, for they are generally adduced from the permanent records made at the time, while oral testimony of witnesses is subject to the uncertainties arising from the failure of memory, as well as from the tendency of witnesses to relate their story of the transaction in the light most favorable to the contention they are called upon to prove. Where a county officer, or his deputy or assistant, engages in the business of buying lands at delinquent tax sales, he must expect that his conduct will be closely scrutinized. The fact that Brashear had an agreement with Foster not to bid against him, while it does not prove that he had a like agreement with Letzkus, it does prove that Brashear was capable of making such an agreement, and when we add that fact to the other circumstances which we have detailed above, and others too numerous to detail within the limits of a judicial opinion, we are led irresistably to the conclusion that the results accomplished at this sale could not have been obtained except by prearrangement of the parties.  Such an arrangement among the bidders renders the sale invalid.  *Lohr* v. *George,* 65 W. Va. 241; *Railway Co.* v. *Marple,* 70 W. Va. 136; *Shrader* v. *Medley,* 74 W. Va. 450; *McDannald* v. *Wilmoth,* 82 W. Va. 719.

. The defendant Letzkus insists that even though the sale might be void as to the defendant Gullette, he is an innocent purchaser for value, and without notice of any of those things which affect it. Whether he was a purchaser for value can make little difference in our view of the case, for the very good reason that if this sale is void upon the ground above indicated he not only had full notice of the things which made it void, but participated in the fraudulent con-. duct which resulted in the decree of the circuit court setting aside the sale. He is not in a position to even suggest that he is an innocent purchaser under the circumstances in this case.

. Our conclusion is that the decree complained of is right, and the same is affirmed.

*Affirmed.*